UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
PIKEVILLE

| | | |
|---|---|---|
| RICHARD WAYNE PARKER, | ) | |
| | ) | |
| Plaintiff, | ) | Civil No. 11-176-ART |
| | ) | |
| v. | ) | |
| | ) | **MEMORANDUM OPINION &** |
| UNITED STATES OF AMERICA, | ) | **ORDER** |
| | ) | |
| Defendant. | ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

Plaintiff Richard Wayne Parker, a former inmate of the U.S. Penitentiary-Big Sandy, has filed a pro se complaint under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b), 2671-80.  R. 1.  Parker asserts that federal officials negligently failed to prevent two other inmates from attacking him in 2009.  *Id.* at 3, 9.  Parker further claims that federal officials were negligent in securing appropriate medical treatment after the attack.  *Id*. at 7. Neither claim survives the United States' motion to dismiss.

## BACKGROUND

Parker, a former police officer, is serving a life sentence for conspiracy to distribute cocaine and for filing a false tax return.  R. 10 at 1.  For over eleven years, Parker successfully concealed his previous profession from his fellow inmates, R. 11 at 2, some of whom might have been interested in exploiting this reversal of fortune.  *See Cayce v. George*, No. 1:11-00046, 2011 WL 6754067, at \*3 (M.D. Tenn. Dec. 23, 2011) (collecting cases noting that former law enforcement officers are at higher risk for violence in prison). But, according to Parker, word eventually got out.

Parker alleges the following:  In September 2008, Parker arrived at Big Sandy.  R. 1 at 4.  Shortly after his arrival, Parker's cellmate told him that prison staff had informed inmates that a former police officer was incarcerated at Big Sandy, and that prisoners were actively seeking this person, presumably for attack.  *Id.* at 5.  Nevertheless, Parker's initial stay at Big Sandy was without incident.  In May 2009, he was temporarily transferred to a prison in the District of Massachusetts.  *Id.*

On July 29, 2009, Parker returned to Big Sandy, and a Special Investigative Services ("SIS") officer met with him to assess whether he could return to the general population.  *Id.* The interview focused on threats he had faced at Big Sandy and other prisons as an incarcerated former police officer.  *Id.*  Parker stated that he knew of no threats that would prevent his return to the general population.  R. 10 at 2.  The SIS officer also asked Parker whether he had ever interacted with an inmate named Warren Beckett.  R. 1 at 5.  Parker responded that he had seen Beckett in the law library but had never interacted with him.  *Id.* Big Sandy staff returned Parker to the prison's general population.  *Id.* at 5-6.

Two inmates attacked Parker the following day.  R. 10-1 at 2.  The assailants, who Parker claims not to have recognized, stabbed Parker twenty-seven times in head, neck, and upper and lower abdomen.  *Id*. at 3; R. 1 at 6.  Prison officials transported Parker to Highland Medical Center, where he was found to have a punctured lung and multiple stab wounds.

So how did this happen?  Parker has a theory.  He believes that prison officials knew about the threat but returned him to the general population anyway.  R. 1 at 9.  Parker thinks either prison guards told inmates about his profession or an inmate discovered it through database searches on the electronic law library.  R. 11 at 2-3.  And, Parker says, once his

identity became known, a reasonable official should have known that "an assault was imminent." *Id.* at 3. Finally, Parker believes that prison officials were aware of this imminent assault through (1) review of inmates' law library search terms; (2) inmate informants; or (3) staff admission that a BOP guard had revealed Parker's identity to inmates. *Id.*

According to Parker, the negligence did not end there. At Highland, medical staff performed surgery on his lung without anesthetizing him. R. 1 at 7. Parker also claims that the doctor treating his injuries originally refused to suture a "gaping stab wound" on Parker's upper lip because he "would not waste time" stitching a prisoner's face. *Id.* at 7. While the Bureau of Prisons correctional officers—who were allegedly in the room—did not intervene, hospital staff did, and the doctor stitched Parker's facial wound. *Id.* The "hasty and sloppy" suturing of Parker's face left "an unsightly permanent scar." *Id.*

Parker remained in medical isolation until August 1, 2009. When Parker contacted his family three days later, he learned that they had not been informed of the attack "despite the [] existence of an 'advance medical directive'" and power of attorney in his BOP file. *Id.* at 7-8. Parker contends that BOP correctional officers were negligent in both failing to contact his family and failing to request proper medical care. *Id.* at 7-8.

In his original complaint, Parker named twenty-three defendants in an action under the doctrine announced in *Bivens v. Six Unknown Federal Narcotics Agents*, 403 U.S. 388 (1971), and the FTCA. R. 1. Parker's *Bivens* claims did not survive the Court's initial screening of his complaint. R. 15; *see* 28 U.S.C. § 1915(a). Parker's surviving claims assert

an action under the FTCA for negligence in preventing the attack and negligence in securing

him proper medical care.

## DISCUSSION

On May 4, 2012, the United States filed a Rule 12(b)(1) motion to dismiss arguing

that the Court lacks subject-matter jurisdiction over Parker's claims. Under Rule 12(b)(1),

there are two types of attacks on jurisdiction: facial and factual. *See Gentek Bldg. Prods.,*

*Inc. v. Sherwin-Williams Co.*, 491 F.3d 320, 330 (6th Cir. 2007). A facial attack alleges that

a complaint insufficiently pleads subject-matter jurisdiction. *Id*. When reviewing a facial

attack, a court assumes that the allegations in the complaint are true, just as in a Rule

12(b)(6) motion to dismiss. *Id*. A factual attack, by contrast, disputes facts alleged in a

complaint that support subject-matter jurisdiction. *Id*. In that instance, there is no

presumptive truthfulness. *Id*. Rather, the Court "must weigh the conflicting evidence to

arrive at the factual predicate that subject-matter [jurisdiction] does or does not exist." *Id*.

The United States' motion presents a factual attack insofar as it states that Parker's claims

are "totally baseless," R. 10-1 at 12, and that "SIS staff at USP Big Sandy assessed the

available information and there was nothing, including Parker's own statements, indicating

Parker had any threats or possible enemies in the general population at USP Big Sandy." *Id.*

In the alternative, the United States moves for summary judgment.

## I.      Discretionary-Function Exception

Parker brought this case under the FTCA, which provides a limited waiver of

sovereign immunity for, among other things, personal injuries caused by government

employees. 28 U.S.C. § 1346(b)(1). The United States, however, has not waived its

immunity for injuries caused by government employees' performance of discretionary acts. 28 U.S.C. § 2680(a); *Montez* ex rel. *Estate of Hearlson v. United States*, 359 F.3d 392, 395 (6th Cir. 2004).

BOP decisions regarding inmate safety fall into the discretionary-function exception. A two-part test determines whether an employee's act was discretionary.   First, courts consider whether the employee's act or omission violated a mandatory regulation or policy. *Sharp* ex rel. *Estate of Sharp v. United States*, 401 F.3d 440, 443 (6th Cir. 2005).  Second, the Court must determine whether the discretionary action was grounded in policy and was thus an act that the exception was designed to shield.  *See United States v. Gaubert*, 499 U.S. 315, 322 (1991).  Here, the BOP has discretion to determine how to accomplish its statutory duty to provide for the safety of inmates.  *See* 18 U.S.C. § 4042; 28 C.F.R. § 541.22-23; *Montez*, 359 F.3d at 396-97.  Moreover, it is clear that government policy permits this exercise of discretion and was thus designed to shield BOP officials' judgments concerning prisoner safety. *Montez*, 359 F.3d at 397.

But, of course, no good exception exists without having an exception to it:  The discretionary-function exception may not apply where federal officials are aware of a specific and immediate threat to an inmate's safety.  *Id.* at 398.  In such cases, "there is a high likelihood that actions are not based in policy." *Ceballos v. United States*, No. 7:11-21-ART, 2011 WL 5855290, at *3 (E.D. Ky. Nov. 22, 2011).  Of course, inaction in the face of a specific and immediate threat may *still* be based in a discretionary policy decision. For example, a prison guard may wait to intervene in an altercation between inmates until it is safe to do so, in accordance with BOP occupational safety policies.  U.S. Dep't of Justice,

Federal Bureau of Prisons Program Statement 1600.09, ch. 1 (Oct. 31, 2007) (directing employees to "[p]erform their duties in the safest possible manner").  Thus, where plaintiffs allege a specific and immediate threat, "the government must still be given the opportunity to explain how its action or inaction was 'grounded' in some kind of policy."  *Ceballos*, 2011 WL 5855290, at *5.

The Sixth Circuit has provided three examples to illustrate the contours of a "specific and immediate" threat:  a yes, a no, and a "close case."  *Montez*, 359 F.3d at 398-99.  A specific and immediate threat exists "[w]here a prison guard stood by while an inmate was chased and severely beaten by 12 other inmates."  *Id.* at 398 (citing *United States v. Muniz*, 374 U.S. 150, 152 (1963)).  No such threat exists simply because the plaintiff was in protective lock-up prior to the attack, or where the plaintiff alleges that officials placed him in a location that was inherently inadequate to protect the plaintiff from assault.  *Id*. at 398-99. A closer case exists when a plaintiff alleges that prison officials were negligent by not informing him that his youthful appearance placed him at a higher risk of sexual assault, and the plaintiff informed guards that another inmate had been staring at him.  *Id*. at 397-98 (citing *Dykstra v. United States Bureau of Prisons*, 140 F.3d 791, 795-96 (8th Cir. 1998)).

## II.    Parker Alleged a Specific Threat

Parker is representing himself, so the Court must liberally construe his pleadings. *Wagenknecht v. United States*, 533 F.3d 412, 415 (6th Cir. 2008).  Read charitably, Parker alleges a (1) a specific threat that (2) was known to federal officials.  Parker contends, first, that either Warren Beckett or his two attackers discovered his identity during an electronic database search in the prison law library or received the information directly from prison

guards.  Second, he alleges that prison officials knew about the database searches or, in the alternative, that officials knew inmates had discovered his identity based on inmate informants or their own malfeasance.  Third, prison officials supposedly believed that Beckett would give this information to Parker's attackers or that his attackers intended to assault any former police officers that they identified themselves.

The government asserts that they were not aware of any threats to Parker.  Yet even if this were true, the Court could not rely on this ground to grant the government's Rule 12(b)(1) motion.  When a factual attack on subject-matter jurisdiction also implicates the merits of the plaintiff's claim, the Sixth Circuit requires a district court to hold that jurisdiction exists and address the objection as an attack on the merits of the plaintiff's claim. *See Gentek Bldg. Prods.*, 491 F.3d at 330.  Here, whether officials knew about an imminent attack on Parker is not only a question about the applicability of the discretionary-function exception but is also relevant as to whether the officials were negligent at all.  Thus, the factual attack presented by the government is "intertwined with the merits" of Parker's claim. *Id*. at 331.  The United States does not otherwise argue that the threat to Parker was not specific or immediate.  Therefore, the Government's factual attack cannot be a basis for a Rule 12(b)(1) dismissal. *Id*.

### III.     Parker Did Not Allege a Sufficiently Immediate Threat

The immediacy of Parker's claim is a close call, but, in the end, Parker has failed to allege sufficient facts for the Court to find that he faced an immediate threat.  Given a liberal interpretation, Parker's pleadings suggest two theories of imminence.

First, Parker infers that the threat was immediate because he was attacked the day after returning to Big Sandy.  R. 1 at 3, 9 (at the time Parker arrived back at Big Sandy on July 29, 2009, an attack was "imminent"); R. 13 at 2.  This fact does Parker little good— every threat is imminent the day before it happens.  After all, there is no evidence that federal officials knew of the immediacy of the threat, despite the fact that the assault occurred within twenty-four hours of Parker's return to the general population.

Second, Parker argues that, without intervention by prison officials, harm was virtually guaranteed once his law enforcement background became known.[1]  Why?  Because, according to Parker, a group of Big Sandy inmates actively seeks former cops for immediate attack.  R. 1 at 5.  From the moment his identity as a former police officer was discovered, prison officials therefore had reason to believe an assault was imminent.  R. 11 at 3.

Yet Parker has not alleged a sufficiently immediate threat.  While his former cellmate supposedly told him that a group of inmates were actively seeking ex-cops for attack, Parker learned of this threat almost a full year before the attack took place.  R. 1 at 5.  Even if the Court accepted that there was an ongoing imminent threat, Parker has not alleged that he was attacked by the same group of inmates or that Beckett was among them.  And even if the Court accepted that Beckett or his attackers were among the cop-hunters, Parker has not alleged that Big Sandy officials knew of the scheme to immediately attack former cops. Even if SIS knew that an inmate discovered Parker's identity through database searches,

---

[1] Parker also claims that the Bureau adopted a "special duty to protect" him based on his high-risk status.  R. 11 at 5. While the declaration of J. Michael Henderson, R. 11-3, is reason to believe that BOP officials knew that his former profession placed him at a higher risk for assault, this fact does not otherwise impact their duties. If officials were aware of a specific and immediate threat, they may be liable under the FTCA.  But it does not follow that BOP officials were negligent (or strictly liable, which appears to be Parker's contention) simply because Parker was attacked.

8

Parker has not demonstrated that BOP officials should have known from this information that an attack was imminent. This discovery would have placed Parker at significantly higher risk of assault, but the knowledge that an inmate is at a high risk for assault is different from the knowledge that an assault is imminent. Nor has Parker presented any facts (beyond asserting that it is "common knowledge" that such things occur in Big Sandy) suggesting that BOP guards gave his identity to the cop-hunters or knew about the impending attack from inmate informants. To survive a motion to dismiss, Parker must present factual allegations that "raise a right to relief above the speculative level." *Mich. Div.-Monument Builders of N. Am. v. Mich. Cemetery Ass'n*, 524 F.3d 726, 731 (6th Cir. 2008) (quotation omitted). He has not done so here.

Applying a strict immediacy rule makes sense for at least two reasons. First, it provides a way to filter out decisions that were not grounded in policy. Second, deference to prison safety decisions is important, and courts should second-guess such decisions only in the rarest of circumstances. *See Dykstra,* 140 F.3d at 796; *cf. Bell v. Wolfish*, 441 U.S. 520, 546-47 (1979) (stressing the "wide-ranging deference" courts owe prison officials "in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security"). Of course, Parker's allegations loosely mirror those that the Sixth Circuit deemed a "close case." *Montez*, 359 F.3d at 398. Like the plaintiff in *Dykstra*, Parker was at a "higher risk of . . . assault." *Id.* (citing *Dykstra*, 140 F.3d at 795). But the *Dykstra* plaintiff also alleged that he told prison guards that a particular inmate had been staring at him. Parker has no such evidence that prison guards knew about an imminent threat—as noted above, even if BOP guards knew

that an inmate discovered Parker's identity through database searches (which Parker merely speculates that they did), guards did not also know that inmate planned an immediate attack. The threat of an unspecified future attack, even if from a specific inmate, is not enough to overcome the discretionary-function exception.

If Big Sandy officials knew that Parker's former profession had been revealed, *and* had reason to believe that this put him at immediate risk of harm, then he may be able to take his case out of the discretionary-function exception. But Parker has stated only his conclusion: that "[i]f SIS at USP Big Sandy were aware that inmates were making queries of his identifiers then they had information which would lead a reasonable investigator to suspect that an assault was imminent." R. 11 at 3. The Court fails to see how Parker's case is different from the many tragic cases in which former law enforcement officials, informants, gang members, or sexual offenders whose identifies are known to their fellow inmates are assaulted while incarcerated. *See, e.g.*, *Cayce*, 2011 WL 6754067, at *3 (former law enforcement officials); *Cerniglia v. Cnty. of Sacramento*, No. 299-CV-01938-JKS-DAD, 2008 WL 1787855, at *3 (E.D. Cal. Apr. 18, 2008) (child molesters, gang-members, informants). Parker was, and is, at higher risk for assault in prison because of his former profession. Without contrary facts, however, the Court must assume that the BOP tried to fulfill its statutory duty to protect the inmates in its care and failed in Parker's case.

## IV. Parker Has Not Stated a Claim for Federal Officials' Negligence With Respect to His Medical Care

Parker also believes that the federal correctional officers who were with him at Highland Medical Center were negligent because they "fail[ed] to request proper medical care" when they observed the treatment Parker received. R. 1 at 7. The United States

contends that Parker has abandoned his medical negligence claim through briefing.  R. 13 at 3 n.1.  The Court need not address this argument because the facts in Parker's complaint do not state a claim upon which relief can be granted.  Essentially, Parker claims that federal employees were required to supervise his medical care even after he arrived at the hospital and was placed in the care of a trained professional.  *Cf. Gottlieb v. United States*, 624 F. Supp. 2d 1011, 1023 (S.D. Ind. 2008) (recognizing pro se claim that prison officials failed to oversee the prisoner's care during a hospital visit survived the independent contractor defense).  While Parker may be unhappy with the care he received at Highland, the facts do not cast a net sufficiently wide to catch the United States.

Where claims arise under the FTCA, government employees are held liable "in accordance with the law of the place where the act or omission occurred."  28 U.S.C. § 1346(b).  Here, Kentucky's substantive law governs.  To show negligence under Kentucky state law, Parker must demonstrate: (1) a duty of care; (2) breach of that duty; (3) actual injury, and (4) the injury was proximately caused by the negligence.  *Strachan v. United States*, No. 6:08-394-GFVT, 2009 WL 1586812, at *9 (E.D. Ky. June 5, 2009) (citing *Mullins v. Commonwealth Life Ins. Co.*, 839 S.W.2d 245 (Ky. 1997)).

The government owed Parker a duty of care whether or not he was in medical custody.  Section 4042(a) of Title 18 directs the Bureau of Prisons to provide for the safekeeping and protection of the inmates in its care.  *See Friedman v. United States*, 221 F.3d 1334, 2000 WL 876391, at *2 (6th Cir. 2000).  To survive the United States' motion to dismiss, however, Parker must allege facts that, if true, would constitute a breach of that duty.  Parker speculates that BOP employees should have done many things differently, but

11

even the most accommodating reading of the facts would not prove that the BOP failed to act reasonably under the circumstances.

The BOP guards were not medical personnel and were thus wisely not expected to make any decisions that could affect Parker's medical treatment. Rather, once they realized that he needed immediate medical care, their responsibility was to get him to a trained medical professional—something which they did. Parker says he was not given anesthesia when Highland treated his punctured lung. This procedure sounds painful, but there is no evidence before the Court to show that this was not the most advisable course of action. Nor is there evidence that a BOP guard with no medical training would have had information to protest what a trained medical professional was doing.

Parker also complains that the BOP guards did not take action after allegedly hearing the doctor comment that he would not "waste time" stitching an inmate's face. But, at the urging of the nurses, the doctor ultimately did suture Parker's face. Even if Parker thinks he did a bad job, there is no evidence that his guards would have recognized sloppy stitching or that the doctor would or could have done a better job if chided by the guards rather than the nurses. More importantly, the guards simply did not have a duty to order the doctor to perform a procedure that he may not have felt was necessary. *See Gottlieb*, 624 F. Supp. 2d at 1026 (dismissing claim where prisoner "failed to demonstrate that the BOP's guards had any medical expertise such that they could have substituted their expertise for that of the hospital's physicians or that the guards could have recognized that the care being provided by the hospital was substandard"); *Fitzke v. Shappelle*, 468 F.2d 1072, 1076 (6th Cir. 1972) (holding that the Eighth Amendment does not require that every request for medical care

12

made by prisoner be honored); *see also Davis v. Stine*, No. 6:06-156 DCR, 2006 WL 3140169, at *8 (E.D. Ky. Oct. 31, 2006) ("Prisoners are not entitled to unfettered access to the medical treatment of their choice." (citing *Hudson v. McMillian*, 503 U.S. 1, 9 (1992))).

Finally, Parker argues that his family should have been contacted per his advance medical directive.  However, Parker has presented no facts indicating that he has suffered any injury from the BOP's failure to do so.

Big Sandy employees recognized that Parker required emergency medical care that they were not able to provide at the prison and transported him swiftly to the care of an appropriate medical professional.  On these facts, the Court cannot envision a more prudent response.

## CONCLUSION

Accordingly, it is **ORDERED** as follows:

1.       The United States' motion to dismiss, R. 10, is **GRANTED** with respect to Parker's claim that it failed to protect him from a specific and immediate threat to his safety; and

2.       The United States' motion to dismiss, R. 10, is **GRANTED** with respect to Parker's claim that it was negligent with respect to his medical care.

This the 26th day of June, 2012.



Signed By:

*Amul R. Thapar*

United States District Judge

13